# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | George M. Marovich | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 98 C 8226 | **DATE** | 11/22/2004 |
| **CASE TITLE** | Perez, et al. Vs. City of Batavia, et al. | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____ . Reply to answer brief due _____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m)   ☐ Local Rule 41.1   ☐ FRCP41(a)(1)   ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] ENTER MEMORANDUM OPINION AND ORDER. The Court grants defendants' motion to strike Gabriela Kennedy's declaration, grants in part and denies in part defendants' motion to strike plaintiffs' response to defendants' statement of material facts, grants City of Batavia's motion for summary judgment, and grants Robert Warner's motion for summary judgment.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | |
|---|---|---|---|
| | No notices required, advised in open court. | | **Document Number** |
| | No notices required. | number of notices | |
| | Notices mailed by judge's staff. | NOV 23 2004 | |
| | Notified counsel by telephone. | date docketed | |
| ✓ | Docketing to mail notices. | | |
| ✓ | Mail AO 450 form. | docketing deputy initials | |
| | Copy to judge/magistrate judge. | date mailed notice | |
| JD | courtroom deputy's initials | | |
| | | Date/time received in central Clerk's Office | mailing deputy initials |

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| EDGARDO PEREZ and JAMES DIXON, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | 98 C 8226 |
| | ) | Judge George M. Marovich |
| CITY OF BATAVIA and | ) | |
| ROBERT WARNER, | ) | **DOCKETED** |
| | ) | |
| Defendants. | ) | NOV 2 3 2004 |

## MEMORANDUM OPINION AND ORDER

Plaintiffs Edgardo Perez ("Perez") and James Dixon ("Sgt. Dixon") filed a four-count amended complaint against defendants the City of Batavia and Robert Warner. In Count I, Perez alleges disparate treatment and racial harassment in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"). In Count II, Perez alleges that both defendants violated the Equal Protection Clause of the Fourteenth Amendment and 42 U.S.C. § 1983. In Count III, Perez alleges that Batavia retaliated against him in violation of Title VII. In Count IV, Sgt. Dixon alleges that Batavia retaliated against him in violation of Title VII.

Each defendant has moved for summary judgment with respect to the claims against him or it. Also before the Court are defendants' motion to strike the declaration of Gabriela Kennedy and their motion to strike plaintiffs' response to defendants' joint statement of material facts. For the reasons set forth below, the Court grants defendants' motion to strike Gabriela Kennedy's declaration, grants in part and denies in part defendants' motion to strike plaintiffs' response to defendants' joint statement of material facts, grants City of Batavia's motion for summary judgment and grants Robert Warner's motion for summary judgment.

# I.    **Background**

Defendant City of Batavia ("Batavia") created the City of Batavia Police Department ("Batavia P.D." or the "Department") by city ordinance.[1] The Mayor of Batavia appoints a Chief of Police for the Batavia P.D. From September 30, 1985 until March 27, 1998, defendant Robert Warner ("Chief Warner") was the Chief of Police for the Batavia P.D.

Batavia also has a Board of Fire and Police Commissioners (the "Board"), which has promulgated the Rules and Regulations for the Batavia P.D. The Board is also responsible for hiring, firing and promoting police officers.

The Board hired plaintiff Edgardo Perez ("Perez"), an Hispanic male, as a police officer in March 1988. From 1990 until 1996, Perez served as a field training officer.

During much of Perez's career with the Batavia P.D., Perez's performance was positive. From 1988 until 1991, Sergeant Vincent Bellafiore ("Sgt. Bellafiore") supervised Perez. During that time period, Sgt. Bellafiore thought Perez was a "very good patrol officer" with a "good career" ahead of him. Sgt. Bellafiore prepared four performance evaluations of Perez, all of which evaluations were positive. Batavia P.D. assigned Perez to serve on the Organized Crime Drug Enforcement Task Force for six months and on the North Central Narcotics Task Force for one year. Perez is the only Batavia P.D. officer to have served on the task force, and he considered it positive for his career. In 1993, the Batavia P.D. created a special position for Perez: he was reassigned to work as a narcotics detective in the Investigations unit, a position he wanted. In addition, Chief Warner requested that Perez become deputized by the sheriff of Kane County so that Perez could do narcotics work in Kane County. Perez was the only Batavia P.D. officer deputized in Kane County.

_____

[1] Unless otherwise noted, the facts outlined in the background section are undisputed.

After his three years as a detective, Perez transferred to the patrol division in October 1994, where he reported to Sergeants John Albertson ("Sgt. Albertson") and Robert Gieser ("Sgt. Gieser"). Sgt. Gieser considered Perez an "outstanding, above average officer" and both of the two performance evaluations Sgt. Gieser prepared for Perez were positive. Perez's next promotion was recommended by Sergeant James Dixon.

The Board hired plaintiff James Dixon ("Sgt. Dixon") in 1975. Sgt. Dixon became sergeant on January 30, 1979. Sgt. Dixon suffered a shoulder injury in 1984 and was on a disability leave from January 1986 until his return to the Batavia P.D. on September 10, 1995.

When Sgt. Dixon returned in September 1995, he was assigned to work with Perez for retraining. Once retrained, Sgt. Dixon resumed his position as patrol sergeant and shared a shift with Sgt. Gieser. In 1996, Sgt. Dixon recommended that Perez be the Officer in Charge ("OIC") on the Dixon-Gieser shift. OIC is a temporary assignment by which a patrol officer assumes the duties and responsibilities of a sergeant when the sergeant is not present. Chief Warner selected Perez to be the OIC, based on Sgt. Dixon's recommendation.

In 1996, Chief Warner selected Perez as Officer of the Year for the year 1995, based on Sgt. Dixon's recommendation.

### A.    Perez's promotion to sergeant

By 1996, Perez was ready to test again for a promotion to sergeant. (He had tested twice before but had not scored well enough to be promoted.) The promotional testing for sergeant (and commander) positions at Batavia P.D. consists of a written test (50% of the final score), an oral interview with the Board (25% of the final score), and a merit and efficiency evaluation (25% of the final score). The written exam is prepared and scored by an outside agency. The Board conducts the oral interview with three outside assessors (police officers from other departments who are at the rank for which the interviewees are applying). During the oral

interview, the Board asks each applicant the same list of questions. The merit and efficiency scoring for sergeant applicants was done by the Chief of Police, the two commanders and the eight sergeants. The highest and lowest scores are dropped, and the remaining scores are weighted equally.

Once the scores are totaled, the three candidates with the highest scores are listed on a promotional list. For the three years following the testing, the Board chooses sergeant candidates from the promotional list. When a sergeant vacancy occurs, the Chief of Police makes a recommendation to the Board with respect to which of the three candidates to promote. The Board determines which candidate will be promoted.

Perez ranked first on the 1996 promotional list for sergeant. Officer Pete Tyo ("Tyo") ranked second, and officer Glenn Autenreith ("Autenreith") ranked third. Tyo and Autenreith are white males. Chief Warner agreed that Perez should be ranked number one on the promotional list for sergeants. At the time of the 1996 promotional testing, Chief Warner believed Perez would make a good sergeant because he "had the skill, knowledge, and the attitude to supervise and provide leadership to officers" below him.

In April 1998, the Batavia P.D. promoted Perez to sergeant. Perez was the first person from the 1996 promotional list to be promoted to sergeant. The Batavia P.D. promoted Tyo on January 5, 1999 (nine months after Perez's promotion) to fill a vacancy created by the departure of Sergeant Michael Rappley ("Sgt. Rappley").

Sgt. Rappley's vacancy was a long time coming. In November 1996, Chief Warner was working on realigning the shifts. Chief Warner wanted to pair Sgt. Rappley with Sgt. Dixon. Chief Warner informed Sgt. Dixon that he had noticed problems–including missed work--with Sgt. Rappley's performance. Chief Warner believed Sgt. Rappley's performance problems were a result of an earlier work-related incident in which an HIV-positive citizen had spit in Sgt.

-4-

Rappley's mouth. Sgt. Rappley was quite upset by the possibility of contracting HIV. Sgt. Dixon agreed to the new pairing, so long as he was given strong veteran officers, including Perez, for his shift.

Thus, as of December 1996, Sergeants Rappley and Dixon were assigned the same shift. For the first five months, Sgt. Rappley used a significant amount of vacation, personal and sick days. Sgt. Rappley was present at work approximately four to six weeks of those first five months. In mid-1997, Sgt. Rappley met with Chief Warner to discuss his options. Sgt. Rappley told Chief Warner that he was thinking of taking his pension because he thought it made no difference to him whether he took a leave of absence versus disability benefits through his pension. (A state statute requires the Chief of police to grant a one-year leave of absence to an officer injured in the line of duty. Chief Warner received a letter from Sgt. Rappley's physician, who stated that Sgt. Rappley could not perform the duties of a police officer due to the HIV incident.) Chief Warner informed Sgt. Rappley that a disability pension would net him about the same amount of pay as a leave of absence. Chief Warner also told Sgt. Rappley that during a leave of absence (as opposed to a disability pension), Batavia would pay for his medical insurance and he would accrue vacation time, sick leave and extra years toward his pension. Sgt. Rappley took a leave of absence until December 10, 1997, when he returned to active duty. Sgt. Rappley was again on a leave of absence by the middle of January 1998. By the end of 1998, Sgt. Rappley took a disability pension. As mentioned above, by January 5, 1999, Officer Tyo, who was second on the promotion list behind Perez, was promoted to fill the vacancy created by Sgt. Rappley's departure.

### B.    Alleged harassment and discrimination at the Batavia P.D.

Perez heard (or heard of) race-based comments over his years at Batavia P.D. In the late 1980's, Officers Rhonda Oker ("Oker") and Autenreith referred to Perez by the nickname

"Bean." Although Perez considered the nickname to be a term of endearment, he asked Oker and Autenreith to stop using it. They stopped.

In 1988, members of the Batavia P.D. gave Perez a statue of the Virgin Mary for his dashboard. Perez believed the gift was derogatory toward Hispanics.

In 1990, Chief Warner found hubcaps in the trunk of Perez's patrol car and commented that he was not surprised to find hubcaps in Perez's car. Perez viewed the comment as discriminatory. He complained to no one.

In 1991, Perez attended a retirement party for Sergeant Fred Behner. During the party, a city employee told Perez he should be the one serving drinks. Perez viewed the comment as discriminatory but did not complain to anyone. The city employee is not in Perez's chain of command. In 1994, the same city employee told Perez he should be out laying bricks with the rest of his people. Perez complained to Sgt. Hubbard, who told Perez he would speak with Commander Dennis Thomas ("Cmdr. Thomas") about the incident. Sgt. Hubbard later told Perez that Cmdr. Thomas said Perez should have thicker skin. Perez believed the incident was resolved to his satisfaction. In 1997, the same city employee made another comment. Perez was reviewing videos of Hispanic gang members. The city employee said Perez should be on the tape with the rest of his family. Perez did not complain to the city employee.

In 1996 or 1997, Cmdr. Thomas, who was unhappy with his drive-through experience at McDonald's, asked, "Why don't they hire real Americans?" Perez assumed Cmdr. Thomas was referring to Hispanic females. Sgt. Dixon told Perez not to complain about the incident.

In 1994, Perez heard officer Dennis Harper ("Harper") refer to patrol of Kirk Road in Batavia as bean patrol. Perez told Harper to stop using the term. Perez heard Harper say "bean patrol" two more times over the next six months. Although other individuals in Batavia P.D. have heard the term "bean patrol" used at Batavia P.D., Perez never heard the term used after

-6-

hearing Harper say it three times in 1994. Perez never complained about the bean patrol comments.

During the summer of 1997, Cmdr. Thomas commented that the Batavia park district swimming pool was "getting a bit too dark" for his liking. Perez assumed that Cmdr. Thomas was referring to blacks or Hispanics. Cmdr. Thomas says he was referring to gang activity at the pool (where Perez and others had patrolled for gang activity for years). Chief Warner told Cmdr. Thomas that such labeling was inappropriate.

On two occasions in 1997, Perez heard Sgt. Lambert refer to West Chicago as "Wet Chicano." Perez did not complain.

Finally, plaintiffs assert that the phrase "driving while Hispanic" was used at the Batavia P.D., but there is no evidence in the record that Perez ever heard the phrase.

Perez also heard racist comments about African-Americans. In 1988, Perez overheard Sgt. Albertson say that Martin Luther King Jr. was just another nigger with attitude. Perez did not complain. Perez heard Sgt. Albertson use the term "nigger" numerous times until 1995, including one time when Sgt. Albertson referred to a Chicago Bulls playoff game as "niggerball." At that time, Perez told Sgt. Albertson he was offended by the word "nigger." Perez heard Sgt. Albertson use the term two more times and then never again. Perez felt that the issue was resolved. (Perez concedes that Sgt. Albertson has not discriminated against Perez on account of Perez's race.)

In February 1996, Perez heard through the grapevine that Officer Harper had referred to an African-American prisoner as a "jungle bunny." Perez did not hear the comment first-hand. Sergeant Thomas Lambert ("Sgt. Lambert") reprimanded Officer Harper.

Perez did not hear any offensive comments about minorities in 1998 or 1999. Perez testified that during his employment at Batavia P.D., no one used an ethnic slur in reference to

him. Perez also testified that no one referred to him by a name that was derogatory toward Hispanics. During his employment with Batavia P.D., Perez was never physically threatened or intimidated by anyone at Batavia P.D. No one at Batavia P.D. ever made a comment to Perez that Perez viewed as physically intimidating. Perez also testified that none of the comments ever affected his ability to perform his job as a Batavia police officer.

On October 30, 1997, Perez filed a charge of discrimination with the EEOC alleging, among other things, that he was subjected to racial harassment. The incident that led Perez to file the charge involved threatened discipline for insubordination with respect to the cleanliness of the locker room.

In October 1997, the Batavia P.D. moved to a new building, and the officers were informed that they needed to keep the locker room clean. According to Perez's testimony (some of the details of which are disputed by defendants), on October 17, 1997, Perez changed in the locker room before working the midnight shift. He left his bag underneath a bench instead of in his locker. When he returned to the locker room at the end of the shift, Perez learned that Sgt. Albertson had confiscated his bag. Perez went to Sgt. Albertson's office. Sgt. Albertson returned Perez's bag to him and told him that he wanted the locker room to be clean and that nothing should be stored on the benches or the floor. When Perez left Sgt. Albertson's office, Perez understood that he was not to store his bag outside of his locker. Minutes later, Perez left his bag on the locker room floor and went to attend roll call. Sgt. Albertson concluded that Perez was guilty of insubordination, which the Batavia P.D. prohibits and defines as:

> disrespectful, insolent or abusive language and/or acts toward a supervising officer, and failure or deliberate refusal to obey a lawful order given by a superior officer or ridiculing the orders of superior officers, whether in his presence or not.

Chief Warner informed Perez that he was giving Perez a one-day suspension for insubordination. Chief Warner told Perez that they knew his record, that he had never done

anything like this before and that they knew he would never do anything like it again. Perez appealed the suspension to the Board, which concluded that a verbal reprimand would be more appropriate discipline for Perez's insubordination. Chief Warner ultimately dismissed the insubordination charge, and Perez was not disciplined.

### C.    Alleged retaliation

On December 4, 1997, in connection with Perez's appeal of the insubordination discipline, Sgt. Dixon met with William McGrath ("McGrath"), an attorney for Batavia. McGrath asked Sgt. Dixon whether he thought any of the allegations in Perez's charge of discrimination were true. Sgt. Dixon told McGrath that he thought some were true. Sgt. Dixon told McGrath that he thought an African-American man had been stopped without probable cause and that he had heard the phrase "driving while Hispanic" used at the Batavia P.D.

#### 1.    Training

In January 1998, an individual outside of the Batavia P.D. asked Perez to put together a three or four-day seminar on defensive tactics for officers. In exchange, Perez would be allowed to take a class on defensive tactics at Northwestern University for free. Chief Warner denied Perez's request to take the outside training on the grounds that there was no need for Perez to take it. Perez's requests for schedule changes so that he could attend the outside training were also denied.

Batavia P.D. granted other requests by Perez to attend training. For example, from August 31, 1998 to September 4, 1998, Perez took a training class called "Leadership development for supervisors" at the University of Illinois. On March 9, 1999, Perez completed a course in the use of force by patrol officers.

## 2. Transfer

Batavia P.D. operates with rotating shifts, such that each group of officers (which is supervised by a team of two sergeants) works the evening shift for 28 days, then the midnight shift for 28 days, then the day shift for 28 days. On January 25, 1998, Sgt. Dixon was transferred from one group to another. The transfer did not change Sgt. Dixon's duties, working hours, compensation or benefits. The transfer changed the identities of the officers he supervised and of the sergeant with whom he worked. Sgt. Dixon did not experience any more problems with the new group than he would have with the old. Sgt. Dixon, however, testified that his new group was less likely to arrive as back-up unless he ordered them to, a fact Batavia disputes.

## 3. 1999 promotional testing

In 1999, Perez, Sgt. Dixon and four other officers participated in promotional testing for commander, which testing was completed June 8, 1999. The individuals with the top three scores on promotional testing are put on the 1999 promotional list for commander and are eligible to be considered for vacant commander positions. The top score of the 1999 promotional testing for commander was 94.36. The second and third highest scores were 81.52 and 81.51, respectively. Sgt. Dixon placed fourth of the six candidates with a score of 80.78. The fifth highest score was 78.34. Perez placed sixth of six with a score of 69.94.

Twenty-five percent of the final score was based on a "merit and efficiency" evaluation. Perez's score on the written and oral examinations were so low that even if he scored the same on merit and efficiency as the highest scorer scored, he still would have had the lowest score overall. Sgt. Dixon received a score of "2" (INCONSISTENT: Occasionally meets described dimension) eighteen times on his "merit and efficiency" evaluations.

## II.    Summary judgment standard

Summary judgment should be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). When making such a determination, the Court must construe the evidence and make all reasonable inferences in favor of the non-moving party. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986). Summary judgment is appropriate, however, when the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); see also Courtney v. Biosound, 42 F.3d 414, 418 (7th Cir. 1994).

## III.    Discussion

### A.    Motion to strike Kennedy declaration

Before considering the merits of defendants' motions for summary judgment, the Court considers two preliminary issues. First, defendants move to strike the declaration of Gabriela Kennedy ("Kennedy"). Kennedy, an employee of plaintiffs' counsel, describes in her declaration the process by which she compiled statistics purporting to show that the Batavia P.D. issued tickets to African-American and Hispanic motorists more frequently than might "be expected" given her calculation of the African-American and Hispanic population in the area.

Kennedy created spreadsheets containing information about the Hispanic and African-American population in various areas in various years. For example, Kennedy's chart includes data collected from the U.S. Census, from which she concluded that in the year 1990, Hispanic individuals constituted 6.82% and blacks constituted 3.12% of the population of Kane and

-11-

DuPage Counties. Kennedy also concluded from the 1990 U.S. Census that the Hispanic population in Batavia was 3.06% and that the black population in the city was 2.84%. In her chart, Kennedy also included numbers from a special census for Batavia in 1993 and 1998. According to Kennedy's charts, the Hispanic population for Batavia in 1993 was 3.16% and in 1998 was 4.71%. According to Kennedy's charts, the black population for Batavia in 1993 was 1.98% and in 1998 was 1.99%. Next, Kennedy collected estimated census data from the U.S. Census Bureau and calculated the estimated population of Hispanic individuals and black individuals in Kane and DuPage Counties. Kennedy calculated that the Hispanic population in Kane and DuPage Counties was 7.85% in 1993; 8.48% in 1995; 8.85% in 1996; 9.23% in 1997; 9.61% in 1998 and 10.02% in 1999. Kennedy calculated that the black population in Kane and DuPage Counties was 3.3% in 1993; 3.39% in 1995; 3.44% in 1996; 3.48% in 1997; 3.51% in 1998; and 3.55% in 1999.

Next, Kennedy calculated the percentage of the individuals ticketed by the City of Batavia P.D. who were African-American or Hispanic and the percentage of tickets that were issued by the Batavia P.D. to African-American and Hispanic individuals. According to Kennedy's affidavit, Batavia produced in discovery a Persons Arrested List for the years 1995, 1996, 1997, 1998 and 1999, each of which listed individuals ticketed. The Persons Arrested List included a column for Race, in which column a "B" indicated that the arresting officer determined the race to be black and an "H" indicated that the arresting officer determined the race to be Hispanic. With respect to her calculation as to the percentage of black individuals arrested, Kennedy added the number of individuals marked "B" in the race column and divided by the total number of individuals ticketed. With respect to her calculation of the percentage of tickets issued to blacks,

Kennedy added the number of tickets issued to individuals marked "B" and divided by the total number of tickets issued.

Unlike her methodology with respect to African-Americans, to determine the percentage of Hispanics arrested, Kennedy did not rely on the "H" designation in the race column. Rather, Kennedy changed the race of some of the individuals arrested from white or nothing (i.e., the race column was left blank) to Hispanic. Males were switched to Hispanic "if the last name appeared to be Hispanic based upon common Hispanic surnames." According to Kennedy's declaration, women were switched to Hispanic if either "the surname appeared to be Hispanic based upon common Hispanic surnames and the first name was ethnic Hispanic" or "the surname was hyphenated and the first surname was Hispanic based upon common Hispanic surnames." Kennedy's declaration explains that she obtained the list of Hispanic surnames from a list of "Heavily Hispanic Surnames" published in *Building a Spanish Surname List for the 1990's – A New Approach to an Old Problem* by David L. Word and R. Colby Perkins, Jr. In their study, the authors note that the chance that an individual with a "Heavily Hispanic Surname" is Hispanic is 75%. Kennedy does not state how she determined whether a first name was "ethnic Hispanic."

Based on Kennedy's analysis, plaintiffs assert in their *Statement of Additional Material Facts* that "the percentage of Hispanics arrested for citation offenses is between 283% and 350% greater than the expected rate, based upon the census data for Hispanics living in Kane and DuPage County" and that the "percentage of tickets issued to Hispanics for citation offenses is between 322% and 393% greater than the expected rate, based upon the census data for Hispanics living in Kane and DuPage Counties."

Defendants move to strike Kennedy's affidavit for failure to comply with the standards set out in Rule 702 of the Federal Rules of Evidence. Rule 702 provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

F.R.E. 702. In *Daubert v. Merrill Dow Pharmaceuticals*, 509 U.S. 579, 589 (1993), the Supreme Court explained that a court faced with a proffer of scientific evidence must act as a gatekeeper to ensure that the testimony "is not only relevant, but reliable." The Supreme Court has clarified that this gate-keeping function applies not only to scientific knowledge, but also to technical or other specialized knowledge. *Kumho Tire Co. Ltd. v. Carmichael*, 526 U.S. 137, 147 (1999).

The Court concludes that the statistical analysis and conclusions plaintiffs seek to admit (based on the declaration defendants seek to strike) constitute technical and specialized knowledge that must meet the requirements of Rule 702 to be considered. Thus, the Court must first consider whether the evidence would "assist the trier of fact to understand the evidence or to determine a fact in issue," i.e., whether the information is relevant. *Daubert*, 509 U.S. 591; F.R.E. 702. Perez argues that evidence of racial profiling is relevant to his racial harassment claim. In *Schwapp v. Town of Avon*, 118 F.3d 106, 111 (2d Cir. 1997), the Second Circuit concluded that evidence that a supervisor told officers to target minorities for traffic stops could be relevant with respect to whether the officer perceived his work environment to be hostile. For this reason, the Court concludes that the statistical evidence has some relevance (albeit marginally) to Perez's hostile environment claim and might be helpful to a fact-finder.

-14-

Next, the Court considers whether the proffered evidence is reliable. Although the factors which determine the reliability of evidence depend on the type of evidence offered, the Court can consider the validity of the methodology, whether the technique has been subjected to peer review and whether the expert properly applied her methodology. *Daubert*, 509 U.S. at 592-593. "A court is expected to reject 'any subjective belief or speculation.'" *Ammons v. Aramark Uniform Services, Inc.*, 368 F.3d 809, 816 (7th Cir. 2004).

The Court finds that the statistics plaintiffs proffer via the Kennedy declaration are unreliable and, hence, inadmissible due to at least four major methodological flaws. The first major flaw is that Kennedy changed individuals' race from white or no race to Hispanic, based on whether the individual has a Hispanic surname and/or a Hispanic first name. Nothing in Kennedy's declaration suggests that this is an appropriate methodological choice or that this is something experts in her field generally do. Nothing in Kennedy's declaration suggests that the officer who issued each ticket was not in the best position to determine the ticket recipient's race. Although the list of Hispanic surnames Kennedy used contained surnames that were 75% likely to indicate one was Hispanic, Kennedy assumed the individuals with such names were Hispanic 100% of the time. With respect to Hispanic first names, Kennedy makes no showing as to how she determined whether a first name was Hispanic and provides no evidence that her assessments have any sound basis.

The second major flaw in Kennedy's methodology is that she did not apply it consistently. Kennedy changed to Hispanic the race of individuals with surnames not on the list of "Heavily Hispanic Surnames."

-15-

The third major flaw in Kennedy's analysis is that the data she used to determine the "expected rate" of tickets for Hispanics and African-Americans bears no relation to what one would actually expect. To determine the expected rate of tickets, one needs to know the number of Hispanic and/or African-American drivers on the roads patrolled by Batavia P.D., not the number of African-Americans and/or Hispanics who live in Kane and DuPage counties. *See* *Chavez v. Illinois State Police*, 251 F.3d 612, 644-645 (7th Cir. 2001). In *Chavez*, the plaintiff compared data from the 1990 U.S. Census with respect to the percentage of Hispanics living in the area to the number of tickets issued to Hispanic drivers in an effort to show a discriminatory effect. The Seventh Circuit said the methodology was unreliable as a matter of law because:

> Census data can tell us very little about the numbers of Hispanics and African-Americans driving on Illinois interstate highways, which is crucial in determining the population of motorists encountered by the Valkyrie officers.

*Chavez*, 251 F.3d at 644. The Seventh Circuit also noted that data from the 1990 U.S. Census was inherently flawed because it undercounted minorities and because the Hispanic population in the United States has increased nearly 60% since the 1990 Census. As in *Chavez*, Kennedy has used as a benchmark a number which sheds no light on the number of Hispanic or African-American drivers Batavia police officers encounter. Because Kennedy's statistical analysis relied on the wrong data, the analysis is unreliable as a matter of law.

The final major flaw in Kennedy's analysis is that she provides no information to help a trier of fact assess the likelihood that the numbers are a result of random chance, rather than discrimination. Usually, statisticians calculate the standard deviation from the norm to determine the likelihood that race played no role in the decision. *See Adams v. Ameritech Services, Inc.*, 231 F.3d 414, 424 (7th Cir. 2000). Generally, statisticians believe that two standard deviations is

enough to show that the result is unlikely (less than a 5% probability) to be the result of chance, i.e., that the result is "statistically significant." *Id.* The Seventh Circuit has rejected the idea that any study is inadmissible as a matter of law just because it is less statistically significant than the usual two standard deviations. *Kadas v. MCI Systemhouse Corp.*, 255 F.3d 359, 362 (7th Cir. 2001). Still, the fact that Kennedy did not bother to perform the standard deviation calculation and, hence, the fact-finder has *no* basis on which to evaluate the statistical significance of the results is one more reason for the Court to conclude that the statistics are unreliable.

Furthermore, in order to admit such specialized testimony, plaintiff also had to show that Kennedy was "qualified as an expert by knowledge, skill, experience, training, or education." F.R.E. 702. Lay witnesses are not allowed to present opinions based on scientific, technical or specialized knowledge. F.R.E. 701. Nothing in Kennedy's declaration provides any information about Kennedy's knowledge, skill, experience, training or education from which the Court could determine whether she qualifies as an expert.

For all of these reasons, the Court grants defendants' motion to strike Kennedy's declaration and strikes all facts in plaintiffs' statement of additional facts which rely on Kennedy's declaration.

**B.  Defendants' motion to strike plaintiffs' response to defendants' statement of facts.**

The second preliminary issue before the Court is defendants' motion to strike plaintiffs' response to *Defendants' Joint Rule 56.1(a)(3) Statement of Material Facts*. Defendants argue that plaintiffs' responses are evasive, argumentative and inappropriately include extraneous factual material.

-17-

Although the Court will not strike the response in its entirety, the Court notes that, pursuant to Local Rule 56.1, where one party supports a fact with admissible evidence and the other party denies the fact without citation to admissible evidence, the Court deems the fact admitted. *See Ammons v. Aramark Uniform Services, Inc.*, 368 F.3d 809, 817-818 (7th Cir. 2004). Similarly, the Court disapproves of plaintiffs' attempt to include additional factual information in their response to defendants' statement of facts. Local Rule 56.1 requires a separate statement of additional facts (which plaintiffs have filed), and the Court hereby strikes any additional facts included in plaintiffs' response to defendants' statement of facts. *Ammons*, 368 F.3d at 817 ("several of [plaintiff's] responses to [defendant's] allegations admit to the allegations but then add other additional facts. These facts should have been included in a separate statement. They were not, and the district court did not abuse its discretion in striking the responses.").

## C. Defendants' summary judgment motions

Next, the Court considers defendants' motions for summary judgment.

### 1. Perez's racial harassment claim against Batavia

Title VII prohibits harassment on the basis of race if the harassment "amount[s] to discrimination 'with respect to [the employee's] compensation, terms, conditions, or privileges of employment.'" *Twisdale v. Snow*, 325 F.3d 950, 953 (7th Cir. 2003) (citing 42 U.S.C. § 2000e-2(a)(1)). To survive summary judgment on a racial harassment claim, the plaintiff "must show: (1) he was subject to unwelcome harassment; (2) the harassment was based on his race; (3) the harassment was severe or pervasive so as to alter the conditions of the employee's work environment by creating a hostile or abusive situation; and (4) there is a basis for employer

liability." *Williams v. Waste Mgt. of Ill.*, 361 F.3d 1021, 1029 (7th Cir. 2004) (citing *Mason v. Southern Ill. Univ.*, 233 F.3d 1036, 1043 (7th Cir. 2000)). Employers are "strictly liable for harassment inflicted by supervisors, subject to an affirmative defense when the harassment does not result in a tangible employment action." *Williams*, 361 F.3d at 1029. Where the alleged harassment was perpetrated by co-workers, the plaintiff "must show that his employer has 'been negligent either in discovering or remedying the harassment.'" *Williams*, 361 F.3d at 1029.

For a work environment to be considered hostile, the "plaintiff must show the work environment was both subjectively and objectively offensive." *Smith v. Northeastern Ill. Univ.*, __ F.3d __, __ (slip op. at 11) (7th Cir. 2004). The plaintiff must show that a reasonable person would find the environment hostile or abusive *and* that he, in fact, perceived it to be hostile or abusive. *Id.* Furthermore, the harassment generally must be directed at the plaintiff. *Id.* at __ (slip op. at 12). The Seventh Circuit has also cautioned:

> Not every unpleasant workplace is a hostile environment. The occasional vulgar banter, tinged with sexual innuendo, of coarse or boorish workers would be neither pervasive nor offensive enough to be actionable. The workplace that is actionable is the one that is hellish.

*Wyninger v. New Venture Gear, Inc.*, 361 F.3d 965, 977 (7th Cir. 2004).

The parties debate the evidence the Court should consider in determining whether Perez's harassment claim survives summary judgment. Perez would like the Court to consider not only conduct Perez deems harassing on the basis of his race, but also comments directed toward other races and sexually harassing conduct directed toward women at the Batavia P.D. Batavia argues Perez does not have standing to sue either for harassment based on someone else's race or for sexual harassment aimed at women in the department and that, accordingly, such evidence is not

relevant to Perez's race harassment claim. Batavia also argues that any allegedly harassing conduct that occurred more than 300 days before Perez filed his charge of discrimination is time-barred.

The Seventh Circuit has cautioned that discrimination and harassment claims must be brought by the victims, not third parties. *Bermudez v. TRC Holdings, Inc.*, 138 F.3d 1176, 1180 (7th Cir. 1998). There, the Seventh Circuit explained:

> Her claim is not that white women were harassed on account of their race or sex, but that persons of any race or sex who were opposed to discrimination felt uncomfortable. We have never recognized this as a valid theory of discrimination under Title VII, and it is hard to see how it could be reconciled with the proposition that laws must be enforced by the victims (or by public prosecutors) rather than by third parties discomfited by the violations. If unease on observing wrongs perpetuated against others were enough to support litigation, all doctrines of justiciability would be out the window.

*Id.* Thus, Perez cannot recover for harassment directed at women or other races.

Still, evidence that Perez observed others at Batavia P.D. being harassed on the basis of their races can be relevant to Perez's race harassment claim because it may be relevant to whether Perez actually believed he was being harassed (i.e., the subjective part of his claim). *See Schwapp v. Town of Avon*, 118 F.3d 106, 111 (2d Cir. 1997) (holding that evidence that a supervisor told officers to target minorities for traffic stops could be relevant with respect to whether the officer perceived his work environment to be hostile). The Court does not, however, see how evidence that individuals were subjected to harassment due to other protected classes—such as disability or sex—could be relevant to Perez's race harassment claim. *See Sidari v. Orleans Cty.*, Case No. 95-CV-7250, 2000 WL 33407343 at *3-5 (W.D. N.Y. Oct. 3, 2000) (excluding evidence of sexual harassment on national origin harassment claim).

Some of the alleged harassment occurred more than 300 days before Perez filed his charge of discrimination with the EEOC. Before one can file suit in federal court to recover on a Title VII claim, one must first file a charge of discrimination within 300 days after the unlawful employment action. 42 U.S.C. § 2000e-5(e)(1). "A hostile work environment claim is composed of a series of separate acts that collectively constitute one 'unlawful employment practice.'" *National RR Passenger Corp. v. Morgan*, 536 U.S. 101, 117 (2002). As the Supreme Court has explained:

> Provided that an act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered by a court for purposes of determining liability.

*Morgan*, 536 U.S. at 117. When considering whether parts of a hostile environment claim are time-barred, the "court's task is to determine whether the acts about which an employee complains are part of the same actionable hostile work environment practice, and if so, whether any act falls within the statutory time period." *Morgan*, 536 U.S. at 120. If some of the acts are not part of the same actionable hostile work environment practice or if none of the acts are within the limitations period, the court will consider them time-barred. *See Lucas v. Chicago Transit Auth.*, 367 F.3d 714, 725 (7th Cir. 2004).

A few events occurred within the statute of limitations, i.e., after January 3, 1997. In 1997, Cmdr. Thomas commented that the Batavia park district swimming pool was "getting a bit too dark" for his liking. On two occasions in 1997, Perez heard Sgt. Lambert refer to West Chicago as "Wet Chicano." In 1997, while Perez watched a video involving Hispanic gang members, a city employee told Perez he ought to be on the tape with his family.

Other incidents occurred more than 300 days before Perez filed his charge of discrimination. Most of these incidents were sporadic and unrelated to other incidents. In the late 1980's, two officers nicknamed Perez "Bean" until he asked them to stop. In 1988, officers gave Perez a statue of the Virgin Mary. In 1990, Chief Warner commented that he was not surprised to see hubcaps in Perez's trunk. In 1996 or 1997, Perez heard Cmdr. Thomas ask why McDonald's did not "hire real Americans" when he had a problem with his drive-through order. In 1994, Perez heard officer Harper refer to patrol on Kirk Road as "bean patrol" on three occasions. These comments are not part of the same actionable hostile environment as the incidents within the limitations period, and they are time-barred.

One series of incidents involved a recurring theme: a city employee (who was not in Perez's chain of command) on three occasions over several years told Perez he ought to be doing things that the city employee witnessed other Hispanics doing. At a retirement party in 1991, the city employee told Perez he ought to be serving drinks. In 1994, the city employee told Perez he ought to be laying bricks with the rest of his people. While Perez was reviewing a "gang tape" in 1997 (and within the limitations period), the city employee told Perez he ought to be on the tape with the rest of his family. Because the city employee's comment within the limitations period is related to that city employee's comments outside the limitations period, the Court concludes that all three incidents involving the city employee are actionable.

Next, the Court considers whether the three incidents with the city employee, together with Sgt. Lambert's reference to "Wet Chicano" and Cmdr. Thomas's statement that the pool was "getting a bit too dark" for his liking, constitute actionable harassment. The Court assumes that the comments were not welcome and that they were based on race. The incidents in their

-22-

totality, however, are not sufficiently severe or pervasive to alter the conditions of Perez's work environment by creating a hostile or abusive situation. As a matter of law, a reasonable person would not find these incidents—which are sporadic and not severe—to be abusive. Perez admitted that no one used an ethnic slur in reference to him and that no one referred to him with a name that was derogatory toward Hispanics. Importantly, Perez testified that none of the comments ever affected his ability to perform his job as a Batavia police officer, as is clear from his placing first on the promotional list for sergeant and his promotion to sergeant. Here, any unpleasantness Perez faced over the years seems outweighed by his success as an officer and his promotion to sergeant, such that any harassment did not affect the terms and conditions of his employment. *See Twisdale*, 325 F.3d at 953 (relying on appointments to task forces and a promotion in concluding that totality of workplace environment was not objectively hostile). Because the Court concludes that Perez's environment was not objectively hostile, it does not consider whether Perez found it to be subjectively hostile.

As a matter of law, Perez was not subjected to racial harassment, and Batavia is entitled to summary judgment on Perez's racial harassment claim.

### 2. Perez's disparate treatment claim

Perez next claims that Batavia discriminated against him by denying him a promotion to the position of sergeant due to his race. Because Perez provides no direct evidence of discrimination, he follows the indirect method outlined in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). To make out a *prima facie* case in the failure to promote context, a plaintiff must establish that: (1) he is a member of a protected class; (2) he applied and was qualified for an open position; (3) he was rejected for the position; and (4) the employer filled the

position with someone outside the plaintiff's protected class or the position remained vacant. *See Bennett v. Roberts*, 295 F.3d 687, 694 (7th Cir. 2002). If the plaintiff makes out a *prima facie* case of discrimination, "the burden shifts to the defendant to articulate a legitimate, non-discriminatory reason for its decision." *Butts v. Aurora Health Care, Inc.*, __ F.3d __, ___ (slip op. at 4) (7th Cir. 2004). Then, "the burden shifts back to the employee to show that the proffered reason was pretextual." *Id.* Evidence of pretext is "evidence that [the proffered reason] was contrived; a mask for discrimination." *Id.* The "ultimate burden of proof to establish discrimination remains at all times with the plaintiff." *Butts*, __ F.3d at __ (slip op. at 4).

Batavia argues that Perez cannot make out a *prima facie* case of discrimination because he cannot show that he was denied a promotion to a *vacant* position. The facts are on Batavia's side. Based on the 1996 promotional testing, Perez was ranked number one on the 1996 promotional list for sergeants. Perez was, in fact, promoted to sergeant in April 1998. Perez was the first person from the 1996 promotional list to be promoted. Perez concedes that he was promoted to the first "actual" vacancy.

Still, Perez claims he should have been promoted sooner. Specifically, Perez argues that had Chief Warner not discussed with Sgt. Rappley the financial implications of his taking a leave of absence versus a disability pension, Sgt. Rappley would have taken a disability pension sooner, thereby creating a vacancy in the sergeant ranks several months before Perez was promoted. Perez argues that a delay in promotion can be an adverse employment action, and the Seventh Circuit agrees. *Collum v. Brown*, 209 F.3d 1035, 1042 (7th Cir. 2000) ("because a failure to promote affects the rate of pay and the accrual of leave, denying [plaintiff] an earlier

promotion was not only adverse, it was materially adverse."). But Perez's claim for delayed promotion cannot survive summary judgment.

The first difficulty Perez has with his delayed promotion claim is that he cannot make out a *prima facie* case of discrimination. Specifically, Perez cannot show that similarly situated individuals not in his protected class were treated more favorably by not suffering a delay in promotion. The fact is that while Perez was waiting for a vacancy (after Sgt. Rappley took a leave of absence), the other two officers–both of whom are white–on the 1996 promotional list were also waiting for a vacancy in the sergeant ranks. They suffered the same promotion delay as Perez, and Perez was the first to be promoted. Thus, Perez cannot make out a *prima facie* case of discrimination.

Even if Perez could make out a *prima facie* case of discrimination, he would still fail to survive summary judgment because he cannot put forth sufficient evidence of pretext. Defendant has articulated a legitimate, non-discriminatory reason for the delay in Perez's promotion: no sergeant vacancy existed before Perez's promotion. In response, Perez argues that a vacancy might have existed earlier if Chief Warner had not shared with Sgt. Rappley the financial consequences of Sgt. Rappley's choice. This is pure speculation. Chief Warner had no control over what option Sgt. Rappley would select. Perez further argues that Chief Warner was not satisfied with Sgt. Rappley's performance and that the pension board ultimately concluded that Sgt. Rappley's injury was not work-related. But the fact that Chief Warner was mistaken about Sgt. Rappley's options is not evidence that Chief Warner was discriminating against Perez because of Perez's race. Perez supplies no evidence from which a reasonable jury could conclude that defendant contrived the reason for not promoting Perez sooner or that Perez's race

was the reason for the promotion delay. To the contrary, the fact that Perez was the *first* person promoted to sergeant from the 1996 promotional list (the first list on which Perez qualified for the promotion) suggests a lack of racial animus.

Because Perez cannot make out a *prima facie* case of race discrimination and because he fails to put forth sufficient evidence from which a reasonable jury could conclude that he was a victim of discrimination, defendant's motion for summary judgment on Perez's failure to promote claim is granted. Defendant is entitled to summary judgment on Perez's disparate treatment claim under Title VII.[2]

### 3. Perez's § 1983 claim(s)

The same standards applicable to Title VII claims are also applicable to § 1983 equal protection claims. *Williams v. Senriff*, 342 F.3d 774, 788 & 791 (7th Cir. 2003). Plaintiffs' brief makes clear that Perez's § 1983 claims against Chief Warner and Batavia are for racial harassment. Given that the standard for racial harassment under § 1983 is the same as under Title VII, plaintiff's claims fail as a matter of law. Defendants' motions for summary judgment with respect to Perez's § 1983 claim are granted.[3]

_____

[2]Plaintiffs' brief mentions no claim for disparate treatment in connection with the Perez's locker room insubordination incident. Even if Perez brought such a claim, it would fail as a matter of law (as Batavia argues) because Perez ultimately faced no discipline arising from the incident and, thus, suffered no adverse employment action.

[3]Although it is not clear from plaintiffs' brief whether or not Perez also asserts a disparate treatment claim under § 1983, such claim would fail as a matter of law for the same reasons Perez's Title VII disparate treatment claim failed.

### 4. Perez's retaliation claim

Perez also claims that he was a victim of unlawful retaliation. Title VII prohibits an employer from retaliating against an employee for opposing unlawful discrimination. *Wyninger v. New Venture Gear, Inc.*, 361 F.3d 965, 980-981 (7th Cir. 2004). A plaintiff has two methods to establish a retaliation claim. Under the direct method, a plaintiff must show "that [he] engaged in protected activity and suffered an adverse employment action as a result." *Id.* at 981. Under the direct approach, "it is clear that 'mere temporal proximity' is not enough to establish a genuine issue of fact." *Id.* (citing *Stone v. City of Indianapolis*, 281 F.3d 640, 644 (7th Cir. 2002)). The indirect approach follows the familiar *McDonnell Douglas* approach, where the plaintiff must first establish a *prima facie* case that: (1) he performed his job adequately; (2) he complained about discrimination; (3) then he (and not otherwise similarly situated employees who did not complain) was (4) subjected to an adverse employment action. *Wyninger*, 361 F.3d at 981. "If the defendant presents unrebutted evidence of a noninvidious reason for the adverse action, he is entitled to summary judgment. Otherwise there must be a trial." *Stone v. City of Indianapolis Public Util. Div.*, 281 F.3d 640, 644 (7th Cir. 2002).

Perez asserts (and defendants do not dispute) that he engaged in protected conduct on October 30, 1997 when he filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"). Perez asserts that he suffered the following adverse employment actions in retaliation for having filed a charge of discrimination: 1) he was denied a training opportunity and denied time off for the training; and 2) he was given poor marks on the "merit and efficiency" portion of the 1999 promotional testing for commander.

The Court considers the denial of training and denial of time off to take the training to be the same action. A denial of training can be an adverse employment action where the employer denies an employee an opportunity to participate in its own training program. *See Pafford v. Herman*, 148 F.3d 658, 667 (7th Cir. 1998) (the *prima facie* case for a failure to train claim requires a showing that defendant "provided training to its employees"; plaintiff "was eligible for training"; and plaintiff "was not provided training under circumstances giving rise to an inference of discrimination"). Where an individual is denied an opportunity for an outside training course on a subject with which he is already familiar, however, such does not rise to the level of an adverse employment action. *Johnson-Carter v. B.D.O. Seidman, LLP*, 169 F. Supp.2d 924, 939 (N.D. Ill. 2001) ("the one-time denial of outside training on a subject already familiar to her is not a material adverse employment action.").

Here, the denial of training is not an adverse employment action. The training was not training offered by Batavia P.D. for all of its employees. Rather, it was an outside training opportunity on a subject Batavia P.D. deemed unnecessary to his job. Such is not an adverse employment action. Furthermore, the fact that Perez was allowed to attend other training suggests the denial was not retaliatory.

Next, Perez argues that he was retaliated against when he was given poor marks for loyalty, attitude, professionalism and judgment on the "merit and efficiency" portion of the 1999 promotional testing for commander. These performance ratings are akin to performance evaluations and constitute adverse employment actions only if they accompany "some tangible job consequence." *Lucas v. Chicago Transit Authority*, 367 F.3d 714, 731 (7th Cir. 2004). If, for example, Perez lost out on a promotion due to the evaluations, they would constitute an

adverse employment action. In this case, however, the "merit and efficiency" evaluations constituted only 25% of the final score. Perez scored so poorly on the written and oral examinations (which Perez does not claim were retaliatory and which constituted 75% of the final score) that even if his evaluations on "merit and efficiency" were as high as the highest scorer scored, he still would have had the lowest score of the applicants and still would not have been in the top three. (Only the top three are eligible for promotion.) Accordingly, the poor marks during the 1999 promotional testing do not constitute an adverse employment action.

Finally, Perez argues that Batavia P.D. retaliated against him when it delayed his promotion to sergeant. As explained above, Batavia P.D. had a legitimate, non-discriminatory reason for delaying Perez's promotion: the lack of a vacant sergeant position. For the same reasons the Court outlined with respect to Perez's disparate treatment claim, Perez's claim that his promotion was delayed in retaliation for his filing a charge of discrimination cannot survive summary judgment.

Accordingly, Batavia P.D.'s motion for summary judgment on Perez's retaliation claim is granted.

### 5. Dixon's retaliation claim

Title VII prohibits retaliation against an individual because he has:

> opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

42 U.S.C. § 2000e-3(a). In order to prevail on a retaliation claim under Title VII, a plaintiff must first show that he engaged in protected activity. *Wyninger*, 361 F.3d at 981. Batavia disputes that Sgt. Dixon engaged in protected activity. On December 4, 1997, Sgt. Dixon told McGrath,

an attorney investigating the allegations in the charge of discrimination Perez filed with the EEOC, that he believed the allegations were true, that he believed an African-American man was pulled over without probable cause due to his race and that he had heard the phrase "driving while Hispanic" used at Batavia P.D. These comments by Sgt. Dixon to McGrath constitute "participat[ing] in any manner in an investigation" and, therefore, constitute protected activity.

Sgt. Dixon claims he was retaliated against in two ways. First, he was transferred from being a sergeant over one group of officers to being a sergeant over another group of officers. Second, Sgt. Dixon claims that his scores on the merit and efficiency segment of the 1999 promotional testing were lower than he deserved.

A transfer will not support a retaliation claim unless it involves "significantly diminished responsibilities and substantially changed working conditions." *Sitar v. Ind. Dep't of Trans.*, 344 F.3d 720, 727 (7th Cir. 2004). A transfer "without any reduction in pay or status" is merely a "minor annoyance." *Herron v. Daimler Chrysler Corp.*, __ F.3d __, __, 2004 W.L. 2453755 at *6 (7th Cir. Nov. 3, 2004). Here, Sgt. Dixon's transfer will not support a retaliation claim because his pay, benefits, duties and hours stayed the same. Sgt. Dixon's (disputed) testimony that the officers on his new shift were less likely to arrive voluntarily as backup on his calls is not a substantial change in his working conditions. Sgt. Dixon (who was, of course, the officers' direct supervisor) retained the power to order backup whenever he needed it. Furthermore, Sgt. Dixon testified that he had no more problems with his new group of officers than he had with his old. The transfer does not, as a matter of law, support a retaliation claim.

Second, Sgt. Dixon, like Perez, argues that he was retaliated against when he was given poor marks on the "merit and efficiency" portion of the 1999 promotional testing for commander.

-30-

These performance ratings are akin to performance evaluations and constitute adverse employment actions only if they accompany "some tangible job consequence." *Lucas*, 367 F.3d 714 at 731.

In this case, the performance evaluations did not lead to a tangible job consequence. Sgt. Dixon argues that but for the "2" ratings, he would have been in the top three candidates on the 1999 promotional testing for commander. That is not so. Only the top three candidates are eligible for promotion to commander, and a commander vacancy occurred in 2001. Sgt. Dixon challenges as retaliatory every instance in which he received a "2" (INCONSISTENT: Occasionally meets described dimension) instead of a "3" (SATISFACTORY: Meets described dimension) for a subcategory on a "merit and efficiency" evaluation. On the three "merit and efficiency" evaluations (three because each of three evaluators filled out an evaluation), Sgt. Dixon received a total of eighteen ratings of "2". Even if Sgt. Dixon received a "3" instead of a "2" each of those eighteen times, however, his total score still would not have been high enough to get him into the top three and onto the 1999 promotional list for commander. Due to the formula by which the total score is calculated, even if Sgt. Dixon received 18 additional points throughout the three merit and efficiency evaluations, his total score would have increased by .6.[4] In order to tie for the last of three spots on the promotional list, Sgt. Dixon needed to increase his total score by .73. Thus, the allegedly retaliatory portions of the merit and efficiency evaluations

_____

[4]Each merit and efficiency evaluation is scored out of a possible 250 points. The total on each merit and efficiency evaluation is then multiplied by .4. The total on the three merit and efficiency evaluations are averaged. One fourth of the average score on the merit and efficiency portion is added to the final score.

did not keep Sgt. Dixon off of the 1999 promotional list for commanders. Accordingly, the evaluations are not actionable retaliation.

Batavia's motion for summary judgment on Sgt. Dixon's retaliation claim is granted.

## IV.   Conclusion

For the reasons set forth above, the Court grants defendants' motion to strike Gabriela Kennedy's declaration, grants in part and denies in part defendants' motion to strike plaintiffs' response to defendants' statement of material facts, grants City of Batavia's motion for summary judgment, and grants Robert Warner's motion for summary judgment.

ENTER:

George M. Marovich
United States District Judge

DATED: Nov. 22, 2006